MEMORANDUM OF DECISION
This is an action in which the Department of Children and Families ("DCF") is petitioning for the termination of the parental rights of the biological father and biological mother of Molly M. and Michael M.
The biological father of these two children is Mark M. The biological mother is Annette D. On February 5, 1999, the mother consented to a termination of her parental rights. The court, after inquiry, found her consent to be given, knowingly, freely and with the effective assistance of counsel.
DCF alleges as grounds for termination of the parental rights of the biological father that (1) there is no ongoing parent- CT Page 4359 child relationship with Michael and Molly, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the children and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the children; and (2) Michael and Molly have been found in a prior proceeding to be neglected or uncared for, and, the biological father has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the children, that he could assume a responsible position in the life of the children.
The petition for termination of parental rights was filed on July 20, 1998. That, therefore, is the adjudication date. The trial of this matter was held April 5, 6, 7, 1999, which are therefore the relevant dates for disposition purposes. It is the burden of DCF to prove by clear and convincing evidence that the allegations of the petition, on either ground, have been proven, and, to prove by clear and convincing evidence that it is in the best interest of Molly and Michael to have their biological father's and biological mother's parental rights terminated.
Throughout the trial the father was represented by counsel who vigorously presented his defense and case. The children were represented by counsel who advocated their interests. Witnesses included the DCF worker, Dr. Mantell, a clinical psychologist, the father's probation officer, several service providers from two different substance abuse centers that the father attended, the father's mother, and the father. It came to the attention of DCF that these children may be covered by the Indian Child Welfare Act, 1978, 25 U.S.C. § 1901, et. seq. Notice of the proceedings was communicated to the Aroostook Band of Micmac Indians of Maine. They have declined to appear and have provided notice that neither the father nor the children are listed on their roll. Therefore, this court determines that these proceedings are not covered any further by The Indian Child Welfare Act.
The court finds the following facts:
The children Michael and Molly are twins, born on January 6, 1995. These children were born prematurely, at seven months gestation, by an emergency Caesarian section a short while after CT Page 4360 their mother suffered an aneurysm caused by abuse of crack cocaine. The children lived with their mother after their birth. The father lived with his family. For approximately six months of Michael's and Molly's infancy, the father lived with the children and their mother. The dates that this occurred were not presented to the court. The biological father could not remember when it was when he testified; all that can be determined is it is not when he was hospitalized and it was before the twins' removal from their mother's home in March, 1997, when they were two years old. For the period of time, other than then, that the children lived with their mother, the biological father would visit about once a week.
The biological father contacted DCF in 1996 and 1997 because he was concerned that their mother was not taking good care of the children because she was an active drug addict. DCF determined that it was necessary to remove the twins from their mother's care for their own well being in March of 1997. The Department asked him if he wanted to be considered as a resource to have the children live with him. He did not offer to assume the responsibility of having Michael and Molly living with him. He knew that this meant that they would be placed in foster care. On April 3, 1997, an ex parte order of temporary custody was granted which granted custody of Michael and Molly to the Commissioner of DCF. They have been in DCF's custody ever since that date.
In April, 1997, the children's maternal grandparents agreed to be the foster placement for Michael and Molly for a period of one year, so that the children's parents would have an opportunity to address their respective addictions and alcohol/drug problems and ready themselves to take care of their own children. The children's father knew that the maternal grandparents had agreed to take care of the children only for one year.
On July 2, 1997, the children, Michael and Molly were adjudicated neglected and uncared for and committed to the care and custody of the Commissioner of DCF for a period not to exceed one year. Petition for extension of that commitment was filed on April 17, 1998. On May 13, 1998, the commitment was ordered extended for a period not to exceed twelve months from July 2, 1998.
At the time that the children were adjudicated neglected and CT Page 4361 uncared for, the court issued expectations to the father. They were: keep all appointments set by or with DCF; keep whereabouts known to DCF or your attorney; visit the children as often as DCF permits; participate in parenting counseling, individual counseling, drug/alcohol counseling; cooperate with ABH and follow recommendation; secure and maintain adequate housing and income; no substance abuse; no involvement with the criminal justice system; random urines; sign release form.
The father acknowledged the following notice at the time of the court's issuance of these expectations: "If you fulfill the court's expectations, you will improve your chances of regaining or permanently keeping custody of your child. Failure to achieve these goals will increase the chance that a petition may be filed to terminated your parental rights permanently so that your child may be placed in adoption."
The biological father, Mark M. acknowledged in his testimony that he had not fulfilled any of the expectations.
The father was referred to parenting classes at the YMCA. He never pursued this.
The father was ordered to keep all appointments with DCF and keep his whereabouts known to them. From July, 1997 (after the neglect disposition hearing) to October 17, 1997, DCF had no idea where the father was; his whereabouts were unknown. He did not remedy the situation. DCF found out he was incarcerated only from the initiatives of inquiry by the case worker. Thereafter, DCF lost track of him until December, 1997. At that time, he called and left a phone number which he was not at when the worker tried to call him. In late December, the child's maternal grandmother called DCF and told the worker that the father was re- incarcerated. This was confirmed by the Department of Corrections. In April, 1998, the father's prison worker called DCF to find out his next juvenile court date. On April 24, 1998, the father called DCF to update the worker on his drug problems, his incarceration and to request a visit with the children. The father was ordered to visit his children as often as DCF permits. He did not visit or request to visit his children after July, 1997 until that telephone call on April 24, 1998. DCF set the visitation up for a date in June, 1998. It was canceled the day before it was to occur by the father's prison worker because of a schedule problem at the prison. Mr. M was due to be discharged from prison to Daytop, a residential substance abuse treatment CT Page 4362 facility. His first visit after July, 1997 took place at Daytop in August, 1998. His visits since then have been one every other month for an hour at Daytop. DCF transports the children to and from visits.
All of these visits have been since the filing of the petition for termination of parental rights. At the first visit, the children simply stared at the father and withstood his crying and clinging to them. Thereafter, visits have been pleasant.
The father also did not attend all appointments with DCF. Besides being "whereabouts unknown." he did not attend all of the administrative case reviews. At these reviews, treatment planning for the family and children is discussed with DCF. He missed the March, 1997 and October, 1997 meetings. Since his incarceration and inpatient treatment thereafter, he has participated in the reviews.
The father was ordered to participate in parenting counseling, individual counseling, drug/alcohol counseling and to participate in a substance abuse evaluation and follow its recommendations. He was also ordered to have no further involvement with the criminal justice system. On September 3, 1997 he was arrested for possession of narcotics, a felony. He was found guilty on October 21, 1997 of that offense and failure to appear and sentenced to 2 years in jail, execution suspended and 2 years probation. (He had failed to appear in court on SepLember 16, 1997.)
The father then sought treatment at Blue Hills a substance abuse treatment facility. He was a patient there from November 2, 1997 to December 9, 1997. His treatment focused on detoxification and stabilization toward recovery. This was his third hospitalization at Blue Hills. He was diagnosed as alcohol and marijuana dependent and a cocaine abuser. His DSM diagnosis was a personality disorder, not otherwise specified. The treating psychiatrist described this personality disorder as manifesting itself by making it difficult for him to remain free of substance abuse. He was discharged on December 9, 1997 to immediately seek after care at St. Raphael's Hospital.
Seven days later on December 16, 1997, he was again arrested for possession of narcotics. He was found guilty of that offense on February 18, 1998. He was sentenced to 4 years in jail, with execution suspended after 6 months in jail and 3 years probation. CT Page 4363 A condition of his probation was the Daytop residential program where he is currently a patient.
Since the date of the disposition on the neglect adjudication, the father has never sent gifts, cards or letters to his two children. He has acknowledged that he was not barred from doing so by his imprisonment or the rules at Daytop. Further, he has not claimed that to do so would have presented an economic hardship for him.
The father failed to attend all appointments set up for him for a substance abuse evaluation and drug screens. DCF set up appointments for him on May 5, 1997, July 17, 1997, August 12, 1997 and November 10, 1997. He never notified DCF that any of these dates were impossible for him to attend. He has had drug screens, evaluation, and treatment at Blue Hills and at Daytop.
DCF has alleged that the father has abandoned his children within the meaning of the statute. Abandonment focuses on the parent's conduct. In re Michael M., 29 Conn. App. 112,614 A.2d 832 (1992); In re Rayna M., 13 Conn. App. 23, 36, 534 A.2d 897
(1987); In re Kezia M., 33 Conn. App. 12, 632 A.2d 1122 (1993). "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of a child." In re Luke G., 40 Conn. Sup. 316, 323, 498 A.2d 1054
(1985); In re Migdalia M., 6 Conn. App. 194, 208-209,504 A.2d 532 (1986).
They were adjudicated neglected on July 2, 1997. He saw the children once in the month of July, 1997. In September, 1997, he made a singular effort to contact DCF regarding visitation. He failed to follow through. The same thing happened on a single occasion in December, 1997. Thereafter there was no other contact until the request for visitation from prison on April 28, 1998.
"Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re Juvenile Appeal (Docket No.9489). 183 Conn. 11, 14, 438 A.2d 801 (1981). In the year intervening from the neglect disposition to the filing of the petition to terminate his parental rights, the father made three phone calls to DCF seeking visitation. He sent no cards, gifts, CT Page 4364 or letters to his children. He did not contact DCF to inquire how his children were doing. The court finds by clear and convincing evidence that the father abandoned his children.
DCF alleges that the father has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, given the age and needs of Michael and Molly that their father could assume a responsible position in their lives.
The language of our statutes makes it clear that in assessing a parent's rehabilitative prognosis, it must be viewed in the context of what is "within a reasonable time, considering the age and needs of the child." § 17a-112 (b)(2). See also In re Luis C.,210 Conn. 157, 167, (1989); In re Davon M., 16 Conn. App. 693,548 A.2d 1350 (1988). The father is presently an inpatient resident at the Daytop substance abuse treatment facility. He has been there for 9 months and is expected to stay another 6 months. During that period of time he cannot provide a home for his children. The plan is to find an apartment and job upon his release and get himself settled in and then seek custody of his children. In the meanwhile, he would have them wait for him to attempt to rehabilitate himself while they stay in foster care. This plan he proposes, at best, would have him ready in 10 months to one year to seek the return of his children. This plan presumes success. As an adult, the biological father has never lived on his own and been self supporting. His abuse of substances is deeply entrenched. The father was evaluated by a court-appointed psychologist on March 5, 1999. His substance abuse reaches back into his early teen age years. He has been drinking alcohol since he was 13 years old; he used marijuana and LSD when he was 13 as well. He used cocaine at 16, heroin at 21 and Percocet and Vicadin at 23 years of age. His abuse of alcohol and cocaine is the most profound.
The father's criminal record dates back to 1992. In that year he was arrested and found guilty of interfering with an officer. In 1994 he was found guilty of offenses arising out of drug related incidents in 1993 and 1994. He was found guilty of breach of peace, unlawful restraint, interfering with an officer, failure to appear, and disorderly conduct. In 1995 he was sentenced for convictions for assault, failure to appear, criminal mischief, and possession of drug/marijuana (General Statutes § 21a-279 (c)) all for incidents which occurred in 1994. In 1995, he was arrested and found guilty of possession of CT Page 4365 drug/marijuana (General Statutes § 21a-279 (c)). In 1997 he was found guilty (in a 1996 incident) of harassment. His arrests and convictions for failure to appear and two separate incident charges of possession of narcotics have been chronicled above.
Testing of the father in his clinical psychological evaluation confirmed that the father has an antisocial personality disorder and a substance abuse dependency problem. It is the opinion of the evaluator that these problems are deeply rooted and date back to his teenage years. As a result of these disorders, the father is likely to have difficulty conforming his behavior to socialized norms. The father's conduct at Daytop is consistent with the evaluator's observations. Since he has been at Daytop, the father has had repeated problems accepting the rules and conforming to the expected behavioral norms there. He has had behavioral problems on 11 different occasions that are noted in his treatment file. They have occurred periodically since August. 1998 up to and including two such incidences in March of 1999. Reports from his care manager as of March 2, 1999 show minimal progress toward treatment goals. This is a regression from two prior month's reports of satisfactory progress toward treatment goals. This downgrading resulted from the father failing to show involvement in his treatment. Further, his care manager has acknowledged that successful functioning at Daytop is not necessarily an indicator of an individual's ability to function successfully in society.
Against the backdrop of these uncertainties and the certainty that the father is minimally 9 months away from testing himself and his resolve to remain substance free and independent, is the history of the father's deeply entrenched problems. As a result of this long history, it was Dr. Mantel's opinion that "[i]t will require at least 12 months after the father's release from his present residential program to determine the success of his community adjustment and to examine his capacity to establish a life for himself and for the children that would minimally meet their needs." That minimum of 12 months must be added to the 5 months left of expected residential treatment; therefore, the minimum time table for the children to continue to be in limbo is about 1 and 1/2 years, and all of that time would be without any assuredness that the father could rehabilitate himself successfully. Dr. Mantel estimates that the time necessary for the father to rehabilitate himself, (if he is successful) is at least 18 to 24 months into the future. The father's personality makes him resistant to therapy and therefore his prognosis is CT Page 4366 guarded.
Michael and Molly are four years old. They have been living in foster care or a relative placement for two years (one year to the time of the filing of the petition). Their father has never been responsible for their care. For only six months of their lives, at most, did he live with them. The father knew that when the children went to live with their maternal grandmother in a relative placement that the grandparents had agreed to take them for one year only: time for the parents to rehabilitate themselves. Instead of doing this, the father became even less responsible to his children. He stopped visiting with them. He took himself deeper and deeper down the road of drug and alcohol addiction. He is not ready to take care of his children in the foreseeable future. His only other plan was to have his mother take care of the children. She does not want that responsibility and cannot do it. It would not be in Michael or Molly's best interest at their age and after their length of time in transitional care, to make them wait an unpredictable but lengthy period of time to see if their father can accomplish his goals. They need permanency and the security that it brings. They deserve it. It is not a reasonable period of time that their father seeks for them to wait to see if he can rehabilitate himself. The court finds that DCF has proven by clear and convincing evidence that the father has failed to achieve such degree of personal rehabilitation that would encourage the belief that he could assume a responsible position in the lives of his children, in a reasonable time given their age and needs. Normally, separate consideration would be given to each child. Here, these children are twins and have lived together all their lives. They are developmentally at the same stage and, while competitive, exhibit typical twin interdependence.
Required Findings
Except in the case where termination is based on consent (as is the case with the mother), in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings as required below. Much of the subject matter of these requirements has been covered in the body of the decision.
(1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent: CT Page 4367 DCF offered parenting counseling, a substance abuse evaluation with treatment following, and was prepared to offer individual counseling, all in a timely manner. The father did not utilize any services offered by DCF except visitation, and that, after a gap of more than one year. The father sought assistance from Blue Hills himself. The one-month stay provided no help — he was arrested one week later. Now he is at Daytop as a requirement of his criminal probation.
(2) Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended: DCF has made reasonable efforts to reunite the family. It provided visitation for the father and service for the father to rehabilitate himself toward the goal of rehabilitation. Those services are detailed in this opinion above.
(3) The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order: the expectations ordered by the court were signed for and agreed to by the father. DCF provided the services listed above. The father by his own admission, as detailed above, failed to comply with any of the expectations. He virtually did not visit; he was arrested and convicted and jailed; DCF had no knowledge of where he was at times; he never secured housing or an income; and he did not remain substance free, or participate in its attendant evaluation, testing and treatment requirements.
(4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties: neither Molly nor Michael have emotional ties to their father. He is an adult who visits them. Molly and Michael have strong emotional ties and positive feelings for their maternal grandparents, with whom they have lived for at least one year. They have not lived with their present pre-adoptive foster parents for at least one year.
(5) The age of the children: Michael and Molly were born January 5, 1995. They are currently 4 years old. They were 3 years old at the time the petitions were filed. They were two years old when they went into DCF custody. CT Page 4368
(6) The efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to:
(A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions. The father has failed to maintain contact with Michael and Molly. He never wrote them; he never sent them cards or gifts at holiday time. He did not visit with them for one year. He did not seek to do so for a full nine months of that year.
(B) the maintenance of regular contact or communication with the guardian or other custodian of the child. The father has failed to maintain regular contact or communication with DCF. The gaps in that communication are chronicled above. There were months when DCF did not know where the father was. Prior to incarceration, he had no address to give DCF to establish communication (after he left his family's home).
(7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent. The father has not been prevented from maintaining a meaningful relationship with Michael and Molly by anyone's conduct but his own. Neither the mother, DCF or any third person, nor economic circumstances prevented the father from establishing or maintaining a meaningful relationship with Michael and Molly.
Disposition
There came a time that the maternal grandparents could no longer care for these children. DCF has placed them in a pre-adoptive home. They have adjusted very well there. They know their foster mother is their family and refer to her as Mommy. They recognize their foster parents as their new mom and dad. They told Dr. Mantel that they have never lived with their other mom and dad. He described the children as happy, healthy, spontaneous, and responsive. He discerned sibling competitiveness in them as twins. When their biological father joined them in the evaluation they displayed shock at seeing him. He was warm and CT Page 4369 comfortable with them. Dr. Mantel described their time together as one of a visiting relationship. It was his opinion that neither of the children have any parent-child relationship with him from their perspective. The children disengaged from him easily. They played comfortably with him but without seeking affection from him as children do from a nurturing parent. Dr. Mantel concludes that besides the time necessary for the father's own rehabilitation, it would also be necessary to establish a parent-child relationship that is currently not in existence.
Michael and Molly have only one opportunity to grow from infants to adults. Their childhood is fleeting. They have lost their early years to the lack of permanency created by their parents' addictions and neglect. They should not be made to wait the time necessary for their father to engage in his pursuit of sobriety, responsibility and rehabilitation. Time is passing for them and the days of the innocence of their childhood cannot be relived.
These findings are made after considering each child's sense of time, need for a secure and permanent environment, the relationship that each has with the respective foster parents, and the totality of all the circumstances. In re Juvenile Appeal(Anonymous), 177 Conn. 663, 667-68, 673 (1979). See also, J. Goldstein, A. Freud A. Solnit, Beyond the Best Interests of theChild 99 (1979).
Based upon the foregoing, the court finds by clear and convincing evidence that it is in the best interest of Michael M. and Molly M. to terminate the parental rights of their biological father and biological mother. It is ordered that the parental rights of the biological mother. Annette D., in and to Michael M. and Molly M. are hereby terminated. It is ordered that the parental rights of the biological father, Mark M., in and to Michael M. and Molly M. are hereby terminated.
It is further ordered that the Commissioner of the Department of Children and Families is appointed the statutory parent for the purpose of securing an adoptive family for these twin children. The Commissioner shall give Michael M.'s and Molly M.'s present foster parents first preference for their adoption. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law. CT Page 4370
Munro, J.